# UNITED STATES DISTRICT COURT
## for the
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
  )  Case No.  24  MJ  20
Information associated with the Apple ID and )
Apple iCloud account ayblow03@iCloud.com )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ❏ contraband, fruits of crime, or other items illegally possessed;
- ❏ property designed for use, intended for use, or used in committing a crime;
- ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2119; 924(c); 844 (i); 844(h); & 21 U.S.C. § 841 (a)(1), & 846 | Carjacking; Use of a firearm during the commission of a violent crime; Use of fire to damage property affecting interstate commerce; Use of fire in furtherance of a federal felony; and Distribution and conspiracy to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Digitally signed by RickHankins409017232-92997 DN: c=US, o=Sprint, ou=External, ou=eSite, cn=RickHankins409017232-92997 Date: 2024.01.12 15:58:55 -06'00'*

*Applicant's signature*

Rick Hankins, ATF SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date: 01/16/2024

*Judge's signature*

City and state:  Milwaukee, Wisconsin          Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application for a search warrant under 18U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the **Target Apple iCloud Account** associated with the following information, and further described in Attachment A, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA:

> A. iCloud account <u>ayblow03@iCloud.com</u>, which is associated with Damonti LOCKHART

2.      The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

3.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

4.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various legal courses related to constitutional law as well as search and seizure authority.  Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

5. In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 300 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,600 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 223 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

6. This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience. Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also

2

aware that smart cellphones are capable of capturing location history for the device. I have previously applied for and received search and arrest warrants related to the crimes of arson and unlawful firearm possession, as well as other crimes. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media. I further know from training and experience that aforementioned data located on Apple iPhones can be saved to the Apple iCloud and stored by Apple Incorporated.

7. Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cellphones are capable of capturing location history for the device.

8. Based on my training, experience, and participation in drug trafficking and firearms trafficking investigations, I know and have observed the following:

a. that people involved in drug trafficking and/or money laundering almost always keep records of their transactions; because drug trafficking generates large sums of cash, it requires the keeping of detailed records as to the purchase and distribution of drugs as well as the laundering of the proceeds; drug traffickers and money launderers typically keep documents demonstrating the purchase of assets, as well as bank records and other evidence of the accumulation of wealth through illegal activities, as well as the methods used to launder the proceeds; such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the drug proceeds on behalf of the organization; these records, unlike the controlled substances, are often maintained for long periods of time; such records are often maintained under the dominion and control of the drug traffickers and money launderers, and as such, are often kept in their residences, businesses, or other locations that they control, including vehicles on their property;

b. that drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection

of these assets by government agencies;

c.   that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.   that drug traffickers must maintain at their residence or other locations they control, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e.   that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

f.   that it is common for drug dealers to secrete contraband, controlled substances, proceeds of drug sales and records of drug transactions, asset purchases and other items noted in the Attachment to this warrant in secure locations within their residences, storage lockers and/or garages associated with their residences, businesses, vehicles and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

g.   that in order to accomplish this concealment, drug traffickers frequently build stash places within their residences or business; there are a number of publications available instructing where and how to build stash places; copies of these types of publications have been found in the residences of drug traffickers;

h.   that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers; these items are maintained by the drug traffickers within their residences, businesses or other locations over which they maintain dominion and control;

4

i. that drug traffickers often utilize electronic equipment such as computers and cellular telephones to generate, transfer, count, record and/or store the information described in items a, c, d, e, g, and h above;

j. that when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities; to accomplish these goals, drug traffickers often utilize domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of cash;

k. that the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as street money);

l. that it is common for drug dealers to physically handle and count the street money after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the street money; law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences, businesses, and other locations controlled by drug traffickers;

m. that it is common for drug dealers to separate their street money by denomination and put this currency in rubber banded stacks in varying increments to facilitate quick counting;

n. that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

o. that the Currency Transaction Report (CTR) (IRS Form 4789) which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

p. that in order to evade the filing of a CTR, drug traffickers often (structure) their

5

currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

q.  that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government; the source of their income reported on these returns is usually falsely stated, misleading or generic in terms; retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other locations under the dominion and control of drug traffickers;

r.  that drug traffickers commonly maintain addresses or telephone numbers in books, papers, or cellular telephone memory, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

s.  that drug traffickers take or cause to be taken photographs of themselves; their associates, their property, and their product; these traffickers usually maintain these photographs in their possession;

t.  that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

u.  that drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons; said firearms are used to protect and secure a drug traffickers property.  Such property may include but is not limited to drug, jewelry, drug paraphernalia, books, records, and United States currency;

v.  that the techniques and practices used by drug traffickers to avoid detection by law enforcement include, but are not limited to, the use of counter-surveillance, multiple locations at which to conduct drug related activities and to keep records and drug, hidden compartments in vehicles used to hide drug and currency, the use of pagers, voice mail, cellular telephones, pay phones, and the use of numerous associates and workers to further their criminal enterprise;

6

w.  that drug traffickers commonly front (provide on consignment) cocaine and/or other controlled substances to their customers and associates, and they maintain the aforementioned books, records, ledgers, and notes of these transactions, most frequently in their residences;

x.  that drug traffickers commonly use telephones, whether a land line (home telephone) or cellular telephones, to arrange for drug purchases or deliveries. It is also common for drug traffickers to maintain and use several cellular telephones at the same time. Typically, when a drug trafficker switches to a new cellular telephone, he/she will keep that phone and not destroy it. Among other reasons, the Drug trafficker will do so to maintain the list of drug related contacts that have been accumulated;

y.  that drug traffickers usually keep paraphernalia for packaging, cutting, cooking, weighing, and distributing controlled substances in their residences and in stash house locations, specifically locations used by the conspiracy to conduct these activities;

z.  that drug traffickers who conduct interstate transportation and distribution of controlled substances must therefore transport the controlled substances themselves or have couriers transport the drugs for them.  Consequently, drug traffickers often keep records of such travel, including airline tickets, bus tickets, and Uber receipts.

9.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony) have been committed by multiple co-conspirators, more specifically for this affidavit, Damonti LOCKHART.  Additionally, there is probable cause to show that LOCKHART has engaged in unlawful trafficking of marijuana in violation of Title 21 U.S.C. § 841 and 846 (distribution of and possession with intent to distribute controlled substances and conspiracy to do so).  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

7

10. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11. In this application I will describe a robbery and shooting that took place February 19, 2023, and the investigation which led to my belief that the robbery was planned and executed by at least 6 individuals. The individuals involved included Alfredo ACOSTA, who ended up a shooting 'victim' due to the incident. This investigation has also led me to conclude that ACOSTA has used his cellphone(s) to communicate as recently as early October 2021, with at least one carjacker (LOCKHART) regarding the carjacking/shooting. As described below, I believed evidence of the carjacking/shooting would be located at LOCKHART's residence (PREMISES 1) and thus I obtained search warrants for the premises.

12. On February 19, 2023, at approximately 5:43AM, the Milwaukee Police Department responded to a shooting near 1727 West Mineral Street, Milwaukee, Wisconsin **("Location 1")**. Upon their arrival, police subsequently located Alfredo ACOSTA, who had been shot multiple times. ACOSTA was found lying on the front porch of XXXX South 18th Street and transported to a hospital.

13. The Milwaukee Police Department later interviewed ACOSTA who stated he and his friend, C.B., were at Potawatomi Casino and then went to a party near South 34th Street and West Pierce Street in Milwaukee **("Location 2")**. ACOSTA said he was driving a Chrysler 300 car that had been rented by his brother, who was later identified as M.A. As he and C.B. left the

8

party and were walking to the Chrysler 300, ACOSTA said they were approached by 5 unknown black males wearing ski masks and carrying firearms. ACOSTA stated he was struck multiple times in the head by the suspects' firearms while the suspects demanded to know where "the money was." ACOSTA stated he told the suspects he did not know what they were talking about. ACOSTA further said the suspects went through his pockets and took his money, necklace, grills, cellphone [phone # (262) 283-2021], and keys to the Chrysler 300 rental car. ACOSTA said he and C.B. were then forced at gunpoint into the suspects' white SUV. ACOSTA stated the suspects drove him and C.B. to C.B.'s address after C.B. provided his address. ACOSTA said the suspects exited the SUV at one point, at which time he exited the SUV and attempted to run away. ACOSTA stated he heard multiple gunshots and was struck multiple times in his leg, ankle, and foot. ACOSTA believed C.B. was targeted for the robbery because C.B. has posted social media videos in which C.B. had flashed a lot of money.

14. The Milwaukee Police Department also interviewed C.B, who was located at his residence - XXXX West Mineral Street. C.B. stated he posted a message on Facebook on February 18, 2023, asking if anyone wanted to go out. C.B. said he received a phone call from ACOSTA, who he has known since high school. C.B. stated he and ACOSTA made plans to go out together. C.B. said ACOSTA picked him up in a 4-door Chrysler rental car. C.B. stated he, ACOSTA, and their friend M.H. first went to Element Nightclub in downtown Milwaukee and then to Potawatomi Casino. While at the casino, C.B. stated he received a phone call from a female he knew as "Pat" who invited him to a party near South 34th Street and West Pierce Street in Milwaukee. C.B. further said he is friends with "Pat" on social media. C.B. stated he and ACOSTA dropped Michael at home before going to the party. C.B. said he and ACOSTA stayed at the party for approximately 45-60 minutes and then left. As they were approaching ACOSTA'S Chrysler rental car, C.B. said

9

two unknown vehicles stopped by them and five unknown male suspects (suspects) exited one of the vehicles. All five were wearing masks. C.B. further said the masked suspects pointed firearms at C.B. and ACOSTA and C.B. was struck in the head with firearms prior to being forced into the suspect vehicle. C.B. said the suspects went through his pockets and took $200 cash and his Apple iPhone. C.B. said the suspects asked where they lived and C.B. provided his home address – XXXX West Mineral Street. C.B. further said ACOSTA fled the vehicle when they arrived at his address, so he also fled from the vehicle, ran into XXXX West Mineral Street, and did not come out until police arrived.

15. The Milwaukee Police Department recovered (24) 9mm ammunition casings from the shooting scene near 1727 West Mineral Street.

16. On February 19, 2023, at approximately 6:45AM, the Milwaukee Police and Fire Departments responded to a vehicle fire at 227 East Townsend Street, Milwaukee, Wisconsin **("Location 3")**. The burned vehicle was identified as a 2020 grey Chrysler 300 with WI license plate #11294AFT (VIN # 2C3CCAGG3LH146281), which was the same vehicle rented on February 18, 2023, by M.A. from Enterprise Car Rental located 5300 South Howell Avenue in Milwaukee, Wisconsin. A 911 caller stated they observed a black male suspect standing near the vehicle within seconds of the vehicle being engulfed in flames. The black male was wearing black clothing with a black face mask. Under these circumstances, I believe the rental car was a vehicle used in interstate commerce that was intentionally destroyed by means of fire.

17. On February 28, 2023, ATF interviewed C.B. and C.B. stated the party near 34th Street and Pierce Street was held inside a photography studio on the first floor of a commercial building. C.B. used digital Google Streetview images on Your Affiant's cellphone and initially identified 3530 West Pierce Street as the building where the party was held. Additionally, C.B.

10

said an unknown Hispanic male traveled with C.B. and ACOSTA to the party. C.B. stated the unknown Hispanic male was an associate of ACOSTA who they ran into earlier that same night.

18. Also on February 28, 2023, ATF Agents canvassed the area of 3530 West Pierce Street and found that address to be a U-Haul self-storage building. ATF Agents then contacted a remodeling construction crew that working at the commercial building located at 3600 West Pierce Street. The construction crew stated that 3600 West Pierce Street had a photography studio on the first floor, which was unlocked and open. ATF Agents also contacted a resident at XXXX South 36th Street who had exterior surveillance cameras that faced toward the intersection of West Pierce Street and South 36th Street, and also captured the front door of 3600 West Pierce. Agents viewed the surveillance video from February 19, 2023, and observed the 2020 Chrysler 300 arrive at approximately 4:36AM and park immediately across the street from the front door of 3600 West Pierce Street. Three individuals exited the Chrysler and subsequently entered 3600 West Pierce Street. The surveillance video also captured a white Jeep SUV travel by 3600 West Pierce Street on three occasions between 4:43AM and 4:46AM. What appeared to be the same white Jeep SUV backed into the north/south alley between 3600 West Pierce Street and 3530 West Pierce Street at approximately 4:54AM. The surveillance camera showed C.B., ACOSTA, and the unknown male exit 3600 West Pierce Street at approximately 5:17AM and walk to the Chrysler 300. ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video showed suspects remove the shirt from C.B. and leave it in the road. The video further showed C.B., and ACOSTA were ushered by the suspects into the white Jeep SUV while the unknown third male appeared to be placed in the

11

Chrysler 300. The white Jeep SUV then traveled south on South 36th Street followed by the Chrysler 300, which was presumably driven by a suspect.

19. On March 1, 2023, ATF interviewed Alfredo ACOSTA. ACOSTA offered the following summary of the evening that led up to his shooting:

20. ACOSTA stated he picked up C.B. and M.H. at C.B.'s house and they all went to Element night club and bar hopped. When he and C.B. left leaving an afterparty later that night, ACOSTA stated that 5-6 guys wearing masks rushed them and placed them in a suspect vehicle. Your Affiant asked ACOSTA what happened to the 3rd male in his vehicle that was also at the afterparty. ACOSTA said he didn't recall a 3rd person in his vehicle that went to the afterparty with him and C.B. After the robbery, ACOSTA stated that the mother of his children called his cellphone number to see if he could retrieve his belongings. ACOSTA said the calls would keep ringing with no answer. While in the suspect's car, ACOSTA said he was thinking of ways to get out of the situation. When the suspects subsequently got out of the vehicle, ACOSTA said he saw his opportunity, so he got out and ran. ACOSTA stated the suspects chased him and he heard several gunshots and was hit 5 times. ACOSTA said that the suspects drove to C.B.'s house and parked near the middle of the street and he heard something about another car being there. ACOSTA said the driver and front passenger got out of the suspect vehicle and is not sure where they went. ACOSTA further stated that suspect seated next to him in the backseat later climbed into the driver seat after a vehicle passed by the suspect vehicle. ACOSTA said the backseat suspect that had climbed into the driver seat pulled the vehicle forward and honked the horn (because of the unknown vehicle that passed by), at which time the two suspects that had exited the suspect vehicle ran back to the vehicle. ACOSTA stated he jumped out of the backseat as the two suspects were returning to the vehicle. ACOSTA said after he fell to the ground from being

12

shot, he got back up and ran on a broken ankle and hid under someone's porch. Acosta said he subsequently knocked on a door and asked them to call an ambulance. ACOSTA said he, C.B., and M.H. also went to Potawatomi Casino on the night of the robbery. ACOSTA said C.B. and M.H. went into the casino while ACOSTA went to drop off a girl he had met at Silk nightclub.

21. Based on my training and experience, individuals carry their cellular phones on their person or in a very close vicinity whether it is day or night. Further, most individuals have their own cellular phones, so it is likely the subject(s) cellular phone is using and/or registering with the cellular tower providing service in the general geographic area of the crime.

22. On March 9, 2023, Your Affiant received records from T-Mobile related to Federal search warrant #23-M-303. The records included Timing advance "True Call" data related to devices that were within the vicinity of the three aforementioned crime locations in Milwaukee, those being 3600 W. Pierce Street (Location 2), 1727 W. Mineral Street (Location 1), 227 East Townsend Street (Location 3). Based on the aforementioned query of T-Mobile data and subsequent analysis, only one phone number, (414) 975-7826, was found to be in the area of locations #1 (the shooting), and #2 (the kidnapping).

23. The account for (414) 975-7826 is listed to Kentreal EVANS at 3618 North 14th Street, Milwaukee, WI 53206 with an activation date of November 29, 2022. This account was terminated on March 11, 2023.

24. Your affiant compared Wisconsin DOC archived inmate recorded calls placed by EVANS while he was incarcerated in 2022 to the T-Mobile call detail records for (414) 975-7826 and found at least 2 contacted numbers that overlapped enough within the two sets of records to make Your Affiant conclude that EVANS was likely in possession of (414) 975-7826 on February 19, 2023.

13

25. A review of the call detail records provided by T-Mobile showed that cellphone number (414) 975-7826 [EVANS] had multiple contacts with cellphone number (414) 526-1156 and (414) 788-9051 on February 18, 2023. A further review of the call detail records also showed EVANS had contacts with cellphone number (414) 309-9038. The users of (414) 526-1156 and (414) 309-9038 have been identified as likely being Geo OWENS and Jhony MARCHENA respectively, as described below—however the user of (414) 788-9051 remains unknown beyond the nickname "Tre".

26. Your Affiant searched the Wisconsin Department of Corrections (DOC) Inmate Solutions system and found that (414) 526-1156 was associated in that database with Geo OWENS, 4151 North 12th Street, Milwaukee, Wisconsin.

27. Your Affiant further reviewed recorded Milwaukee County Jail calls and located a call placed by inmate #2022007557 on January 17, 2023, at 1:34PM to (414) 526-1156. In that call, the inmate referred to the male who answered the phone as "Geo". Your Affiant also obtained records from AT&T related to Federal search warrant #23-889M related to (414) 526-1156. According to AT&T records, (414) 526-1156 is registered to a "Rick James" at 4919 West Capitol Drive, Milwaukee, Wisconsin. A query of that name and address did not produce results. The email linked to the AT&T account is WUZYMOO@yahoo.com, which is an email associated with Geo OWENS (DOB: XX/XX/1997) according to a query of the law enforcement database TLO. The AT&T account has been active since June 11, 2021.

28. Based on the above information, I believed (414) 526-1156 to be possessed by Geo OWENS on February 19, 2023.

29. Your Affiant also queried number (414) 309-9038 in TLO, which is an online law enforcement database after this number was found to be in the call detail records for 414-975-7826

14

during the matters under investigation on February 19, 2023.  TLO search results showed that number (414) 309-9038 was associated with Jhony MARCHENA (DOB: 2/23/2002) at 3402 North 23rd Street, Milwaukee, Wisconsin. Your Affiant further reviewed a recorded DOC call placed by inmate #666785 to (414) 309-9038 at 12:43PM on January 19, 2023, and a male answered the call.  In that call, the male explained to the inmate that the male had court on that same date and that he was trying to combine his criminal cases so that he could get a combined sentence.  A query of Wisconsin CCAP showed that Jhony MARCHENA was in Milwaukee Circuit Court on January 19, 2023, regarding two separate open felony cases: 2022CF003603 (unlawful possession of a firearm, bail jumping, and possession of THC with intent), and 2022CF002146 (unlawful possession of a firearm and resisting arrest).

30.     Based on the above information, I believe cellphone number (414) 309-9038 was likely possessed by Jhony MARCHENA on February 19, 2023.

31.     On June 1, 2023, ATF executed Federal Search Warrant #23-MJ-122 at the residence of Jhony MARCHENA located at 9070 North 86th Street, Milwaukee, Wisconsin, which was signed by Magistrate Judge William Duffin.  ATF located an iPhone 13 Pro Max with the ID of Jhony MARCHENA.  The following is a summary of information located on the iPhone 13 Pro Max cellphone (ATF Item #40) located with MARCHENA'S ID:

32.     The cellphone data showed it was activated with cellphone number (414) 309-9038 and included IMSI #311480724551071.  Among other things, the data extraction also showed the contact list on MARCHENA'S iPhone 13 Pro Max included the following pertinent phone numbers:

**"Trelly"** – (414) 975-7826 [Previously associated with Kentreal EVANS]
**"Gts G"** – (414) 526-1156 [Previously associated with Geo OWENS]

**"Gee"** – (305) 342-6049 [Subsequently associated with Geo OWENS]

**"Lil Tre"** – (414) 788-9051

**"Lil Tre"** – (414) 779-2527, which was created on 2/6/2023.

**"Lil Bro Monti"** – (414) 399-4919 [Later associated with Damonti LOCKHART]

**"Quis"** – (414) 397-2342, which was created on 12/30/2022. [Later associated with Marquis HARRIS]

**"Quis"** – (414) 779-7848, which was created on 2/24/2023. [Later associated with Marquis HARRIS]

**"Fredo2"** – (262) 283-2021, which was created on 1/16/2023 [ACOSTA's phone number, per Charter Communications, see below]

**"Zach"** – (414) 708-8210

33. Your Affiant further reviewed text messages between MARCHENA and Kentreal EVANS aka "Trelly" at (414) 975-7826, which begin on 2/19/2023 at 2:15PM.

34. These texts between MARCHENA and EVANS included exchanges on 2/25/2023 and 2/26/2023 in which MARCHENA seeks EVANS' help in apparent potential robberies—each time describing targets he was observing and describing the potential "move".

35. Your Affiant reviewed records from T-Mobile that were previously obtained pursuant to Federal search warrant #23-890M related to cellphone number (414) 397-2342. The records review revealed that the shooting victim Alfredo ACOSTA may have possessed phone number (414) 397-2342 for a period of time on February 19, 2023, as further detailed below, but that number was also possessed by another person:

36. Analysis of the T-Mobile Timing Advance data obtained for that cellphone number (ATF Item #26) showed that that number arrived at or near Potawatomi Casino at approximately 2:44AM on February 19, 2023, and then moved to the area of 1810 West Wisconsin Avenue by

16

approximately 2:48AM until it returned to the area of Potawatomi Casino by approximately 3:05AM and then traveled to the area of 1810 West Wisconsin Avenue. Cellphone number (414) 397-2342 stayed in the area of 1810 West Wisconsin Avenue until approximately 3:55AM and it became mobile and later arrived at or near the casino at approximately 3:56AM. The phone number then traveled away from the casino at or about 3:57AM. In their separate interviews, M.H., C.B. and Alfredo ACOSTA all stated that ACOSTA had dropped off the group at the casino, left and then returned to the casino. The movement of (414) 397-2342 to and from the casino on February 19, 2023, is consistent with that number being possessed by ACOSTA or someone that traveled near ACOSTA.

37. There was no Timing Advance data recorded for (414) 397-2342 between 5:35AM – 7:08AM on February 19, 2023, which is consistent with that device being off during that time. When the device was powered on at 7:08AM, the Timing Advance data showed it to be at or in the area of 4151 North 12th Street, Milwaukee, Wisconsin, which was the listed residence of Geo OWENS. Alfredo ACOSTA was hospitalized at this time and did not possess the cellphone.

38. A query of the call history for (414) 397-2342 showed that it had the most frequent contacts with (414) XXX-6964, which is a number associated with a C.H. per TLO. C.H.'s listed address is XXXX East Cudahy Avenue, Cudahy, Wisconsin. The Timing Advance data for (414) 397-2342 showed that the device had multiple location indicators in the area of XXXX East Cudahy Avenue. The device also showed to be within approximately .2 miles of XXXX East Cudahy Avenue after 7:08AM on February 19, 2023, and the phone received incoming calls from (414) XXX-6964 on the afternoon of February 19, 2023. The records for (414) 397-2342 also showed that all incoming calls beginning at 9:01AM on February 19, 2023, went to voicemail.

39. Your Affiant interviewed C.H. in an attempt of identify "Quis", who was the listed name for (414) 397-2342 in MARCHENA'S cellphone. C.H. said the father of her children was Marquis HARRIS (DOB: XX/XX/1997) who had a current cellphone number of (414) 779-7848, which was the most current contact number for "Quis" in MARCHENA'S iPhone.

40. T-Mobile tower dump records showed that (414) 526-1156 [OWENS] called (414) 397-2342 [HARRIS] at 4:40AM and 4:57AM on February 19, 2023, while (414) 397-2342 was at or near 3600 West Pierce Street.

41. On July 6, 2023, ATF re-interviewed C.B. and C.B. provided the following:

42. C.B. stated that ACOSTA had dropped off C.B., M.H., and the third male at the casino and then ACOSTA left the casino. C.B. said he recalled seeing a female in the car with ACOSTA at the casino at some point. C.B. could not recall where or when the female got into the car. C.B. said it was ACOSTA'S idea to go to the casino. Your Affiant showed C.B. a Milwaukee Police Department booking photograph of Marquis HARRIS (DOB:1/23/1997) and asked if C.B had ever met the person in the photograph. Upon seeing the photograph of HARRIS, C.B. immediately stated, "That's him!" C.B. further stated that HARRIS was the fourth unknown male that was with C.B., ACOSTA, and M.H. on the night of the robbery. C.B. said HARRIS was with him and M.H. at the casino. C.B. also said HARRIS went to the afterparty with C.B. and ACOSTA. C.B. further stated that HARRIS was in the front passenger seat of ACOSTA'S Chrysler 300 when ACOSTA first picked up C.B. and M.H. earlier that night at C.B.'s house before they went bar hopping together.

43. Your Affiant asked C.B. how confident he was that HARRIS was the previously unknown male that accompanied the group all night (including to the casino and afterparty). C.B. said he was "very confident" that HARRIS was the guy with them all night. C.B. further said he

18

had met HARRIS on previous occasions through ACOSTA and knew HARRIS' face, so he was very confident. C.B. stated he thought HARRIS looked like he was part Hispanic in person, but his photograph made him look more African American. C.B. said he recalled ACOSTA call HARRIS a name that sounded similar to "Reece".

44. ATF specifically asked ACOSTA during his interview to identify the previously unknown third male who accompanied ACOSTA and C.B. to the afterparty and ACOSTA said he did not recall that a third person was with him and C.B.

45. C.B. also volunteered that he had seen HARRIS on previous encounters hanging out with a local rap artist by the name "Global Star" or something similar to that name. Your Affiant then showed C.B. a digital photograph of Geo OWENS from OWENS' Facebook page "Lilg Globaltrapstar". C.B. identified OWENS as the rap artist who C.B. has seen hanging out with HARRIS.

46. A query of the (414) 399-4919 in the law enforcement database TLO showed that number to be a T-Mobile number associated with Damonti Lamar LOCKHART (DOB: XX/XX/2003) at 4280 South 43rd Street, Greenfield, WI.

47. LOCKHART'S cellphone number (4919) was also located in the following call detail records:

    A. T-Mobile records for (414) 975-7826, which is a cellphone number associated with Kentreal EVANS (ATF Item #28)

    B. Verizon records for (414) 309-9038, which is a cellphone number associated with Jhony MARCHENA (ATF Item #29)

    C. T-Mobile records for (414) 788-9051, which is a cellphone associated with an unknown suspect (ATF Item #27)

    D. T-Mobile records for (414) 397-2342, which is a cellphone associated with Marquis HARRIS – (ATF Item #26)

19

E. AT&T records for (414) 526-1156, which is a cellphone associated with Geo OWENS (ATF Item #25)

48. Your Affiant subsequently reviewed business records (to include call detail records, Timing Advance data, and cell tower data) previously provided by cellphone carriers (via legal process) to create a timeline summary of contacts and general locations of relevant cellphone devices related to the carjacking, abduction, shooting, and arson on February 19, 2023. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

49. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data, Global Positioning Device ("GPS") data or Timing Advance Data. Based on my training and experience, Timing Advance data provided by T-Mobile has a GPS accuracy radius that ranges from approximately 100-300 meters.

The following timeline summary[1] is a revision of the pre-existing timelines as result of additional analysis of cellphone records and information obtained from interviews. Specifically, I believe

---

[1] Information detailed in the subsequent timeline was derived from the following records: T-Mobile records for (414) 975-7826, which is a cellphone number associated with Kentreal EVANS (ATF Item #12 and #28); AT&T records for (414) 526-1156, which is a cellphone number associated with Geo OWENS (ATF Item #24 and #25); Verizon records for (414) 309-9038, which is a cellphone number associated with Jhony MARCHENA (ATF Item #29); T-Mobile records for (414) 788-9051, which is a cellphone associated with an unknown suspect (ATF Item #27); T-Mobile records for (414) 397-2342, which is a cellphone associated with Marquis HARRIS – (ATF Item #26); Verizon records for (213) 474-6888, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #1* (ATF Item #51); Charter Communications records for (262) 283-2021, which is a cellphone associated with Alfredo ACOSTA – *ACOSTA cellphone #2* (ATF Item #23); T-Mobile records for cellphone tower dumps (ATF Item #10); T-Mobile records for (262) 402-0511, which is a cellphone number associated with C.B. (ATF Item #45); Surveillance video obtained near 3600 West Pierce Street (ATF Item #2); Interview of C.H.; Search of MARCHENA'S

20

that Alfredo ACOSTA was in possession of two cellphones on February 18-19, 2023. In previous reports, Your Affiant believed ACOSTA possessed (414) 397-2342 on February 19, 2023. However, an additional interview and cellphone data analysis has shown that (414) 397-2342 was likely possessed by Marquis HARRIS on that date and that cellphone may have traveled for a period of time with ACOSTA or near ACOSTA. Additionally, ATF received call detail records from Verizon regarding number (213) 474-6888 that revealed this number had numerous contacts with the mother of ACOSTA'S children. Specifically, the mother of ACOSTA'S children called this number numerous times following the shooting which is consistent with ACOSTA stating that she called one of his phones after the shooting. Therefore, it is believed that (213) 474-6888 was possessed by ACOSTA on February 19, 2023.

50. The following timeline is a summary and does not include all contacts or movements of the cellphone devices. The timeline has been condensed in an effort to detail the apparent connection between co-conspirators and the alleged criminal activity.

### *All times are for February 18, 2023*

| | |
|---|---|
| 7:05PM | ACOSTA cellphone #2 called C.B. for 459 seconds. |
| 7:11PM | OWENS and MARCHENA both attempted to call HARRIS cellphone. |
| 7:14:52PM | ACOSTA cellphone #1 initiated a Facetime call with OWENS that lasted until 7:19:09PM. |
| 7:19PM | ACOSTA cellphone #1 called HARRIS cellphone. |

iPhone (ATF Item #40) seized during search warrant; T-Mobile records for the (414) 399-4919, which is a cellphone associated with Damonti LOCKHART – (ATF Item #93)

21

| | |
|---|---|
| 7:31PM | LOCKHART called OWENS for 1:05 minutes. |
| 9:48PM | Timing Advance data for HARRIS' cellphone showed it arrived in the area of downtown Milwaukee and stayed in that general area until approximately 2:24M on 2/19/2023. |
| 11:16PM | OWENS called HARRIS' cellphone for 201 seconds. |
| 11:37PM | OWENS called LOCKHART for 3:57 minutes. |

**All times are for February 19, 2023**

| | |
|---|---|
| 12:09AM | OWENS called LOCKHART for 13 seconds. |
| 2:44AM | HARRIS' cellphone arrived at or near Potawatomi Casino according to Timing Advance data. |
| 2:55AM | OWENS called HARRIS' cellphone. |
| 3:03AM | Timing Advance data for EVANS' cellphone showed it in the area of Potawatomi Casino and it stayed in the area of the casino until approximately 3:52AM. |
| 3:04AM | Timing Advance data for cellphone (414) 788-9051 showed it in the area of Potawatomi Casino until at least approximately 3:50AM. |
| 3:12AM | MARCHENA called LOCKHART. |
| 3:33AM | OWENS called MARCHENA for over 4 minutes in an apparent 3-way call with HARRIS' cellphone while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 3:41AM | C.B., M.H., and HARRIS were on video at Potawatomi Casino. |
| 3:41AM | OWENS called MARCHENA for 208 seconds while MARCHENA utilized a cell tower and sector that provide coverage for an area that included Potawatomi Casino. |

22

| | |
|---|---|
| 3:47AM | MARCHENA called OWENS while MARCHENA utilized a cell tower and sector that provided coverage for an area that included Potawatomi Casino. |
| 4:16AM | OWENS called MARCHENA while MARCHENA utilized a cell tower and sector that provide coverage for an area that included 3600 West Pierce Street. |
| 4:17AM | Surveillance video near 3600 West Pierce Street captured images of a white Jeep SUV travel eastbound on West Pierce Street. |
| 4:17AM | T-Mobile Timing Advance data showed EVANS' cellphone, as well as (414) 788-9051, were in close proximity to 3600 West Pierce Street at this time and then both devices subsequently traveled east. |
| 4:33AM | T-Mobile Timing Advance data showed HARRIS' cellphone had traveled west from West National Avenue and South 21st Street. |
| 4:33AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included 3600 West Pierce Street. |
| 4:36AM | Surveillance video near 3600 West Pierce Street captured the arrival of the 2020 Chrysler 300 that was driven by Alfredo ACOSTA and also occupied by C.B. and HARRIS. |
| 4:36AM | Timing Advance data showed that HARRIS' cellphone arrived near 3600 West Pierce Street and stayed in that area until approximately 5:19AM. |
| 4:38AM | Surveillance video captured the three occupants of the 2020 Chrysler 300 enter 3600 West Pierce Street. |
| 4:40AM | OWENS called HARRIS' cellphone for 75 seconds. |
| 4:42AM | OWENS called MARCHENA while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |

23

| | |
|---|---|
| 4:43AM-4:46AM | Surveillance video captured a white Jeep SUV travel by 3600 West Pierce Street on three separate occasions. |
| 4:54AM | Surveillance video captured images of a white Jeep SUV parked in the alley immediately east of 3600 West Pierce Street. |
| 4:54AM-5:19AM | Timing Advance data showed EVANS' cellphone and (414) 788-9051 were in close proximity of 3600 West Pierce Street. |
| 4:57 AM | OWENS called HARRIS' cellphone while that number was at or near 3600 West Pierce and OWENS was utilizing a cell tower located at 3950 North Holton Street, Milwaukee which was over 7 miles northeast of 3600 West Pierce Street. |

*There is no activity on HARRIS' cellphone from 4:57AM – 9:01AM*

| | |
|---|---|
| 4:57:56AM | MARCHENA called OWENS while MARCHENA utilized a cellphone tower and sector that provided coverage to an area that included 3600 West Pierce Street. |
| 5:17AM | Surveillance video captured images of ACOSTA, C.B., and HARRIS exit 3600 West Pierce Street. The three males walked toward the Chrysler 300 and ACOSTA had opened the driver's door and C.B. was near the middle of West Pierce Street when four suspects emerged from the area of the white Jeep SUV and appeared to point firearms at the victims at which time the victims got on the ground. The video further showed C.B., and ACOSTA were ushered by the suspects into the white Jeep SUV while HARRIS appeared to be placed in the Chrysler 300 along with one suspect from the white Jeep SUV. |
| 5:19AM | Surveillance video captured images of the white Jeep SUV and the Chrysler 300 travel southbound on South 36th Street and out of frame. |
| 5:19AM | Timing Advance data for EVANS, HARRIS' cellphone, and (414) 788-9051 showed that all three devices traveled away from 3600 West Pierce Street at this time. |

24

| | |
|---|---|
| 5:21AM | Timing Advance data showed that HARRIS' cellphone was in the area of 35th Street and I-94. |
| 5:21AM | Timing Advance data for EVANS' cellphone showed that this device was in the area of North 41st Street and I-94, Milwaukee. |
| 5:22AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower and sector that provided coverage for an area that included I-94 immediately north of American Family Field and while (414) 788-9051 was also in that same general area. |
| 5:24:02AM | MARCHENA's cellphone password was entered to pair the cellphone with an unknown vehicle Uconnect software system via Apple Carplay. Uconnect is a software platform that can be found in the following vehicles: Chrysler, Dodge, Jeep, Wagoneer, Ram, and FIAT. |
| 5:31AM | MARCHENA called (414) 788-9051 while MARCHENA utilized a cellphone tower that provided coverage to an area that included I-894 and (414) 788-9051 utilized a cellphone tower and sector that provided coverage to an area that included 1727 West Mineral Street. |
| 5:32AM-5:36AM | Timing Advance data showed that EVANS' cellphone was in the area of South 24th Street and Lapham Street, which was less than 1 mile southwest of 1727 West Mineral Street. |
| 5:33AM | Timing Advance data showed that HARRIS' cellphone was near the shooting scene at 1727 West Mineral Street. |
| 5:34AM | OWENS called (414) 788-9051 while OWENS utilized a cellphone tower and sector that provided coverage for an area that included 1727 West Mineral Street. |
| 5:35AM | Timing Advance data showed that HARRIS' cellphone was near 1727 West Mineral Street. There was no Timing Advance data available again for this number until 7:08AM, which is consistent with the device being turned off. |

| | |
|---|---|
| 5:38:53AM | Phone number (414) 788-9051 [Unknown suspect] initiated a Facetime call with OWENS that lasted until 5:41:47AM. |
| 5:42:20 AM | MARCHENA had an incoming call from (414) 788-9051. |
| 5:43AM | 911 call for shooting near 1727 West Mineral Street – C.B. and ACOSTA fled from the white Jeep SUV near this location. |
| 5:52:04AM | MARCHENA had an incoming call from (414) 788-9051. |
| 6:18:41AM | MARCHENA initiated a Facetime call with OWENS that lasted until 6:18:58AM. |
| 6:35AM | MARCHENA called (414) 788-9051. |
| 6:35AM | LOCKHART called MARCHENA. |
| 6:37AM | OWENS called EVANS while EVANS was located near North Oakland Avenue and East Kenmore Place and OWENS utilized a cellphone tower located at 3950 North Holton Street, which was less than 1.5 miles northeast of 227 East Townsend Street. |
| 6:37:31AM | EVANS initiated a Facetime call with OWENS that lasted until 6:39:20AM. |
| 6:40AM | LOCKHART called (414) 364-9146 while both cellphones utilized a cell tower that provided coverage for an area that included 227 East Townsend Street, Milwaukee, Wisconsin. |
| 6:45AM | 911 call for vehicle fire at 227 East Townsend in Milwaukee – 2020 Chrysler 300 that had been stolen from ACOSTA at 3600 West Pierce. |

51.     Based on the above timeline, I believe OWENS played a role in coordinating the carjacking on February 19, 2023, and subsequent crimes, and OWENS' knowledge and participation is supported by his cellphone's movement to the area of the shooting after the carjacking. I also believe the HARRIS and ACOSTA likely had prior knowledge of the carjacking and robbery based on the phone contacts with the people who appeared in the areas of the casino,

26

the carjacking location, and the shooting location. I believe that HARRIS was associated with OWENS, MARCHENA, EVANS, LOCKHART, and the possessor of (414) 788-9051 because all of those numbers were in the call detail records for HARRIS. LOCKHART'S participation in the conspiracy is supported by the apparent presence of his cellphone in the area of the vehicle arson as well as recorded jail calls that will be detailed later in this affidavit. The timing and sequence of calls, and the general locations of devices at critical times leads Your Affiant to believe there was a conspiracy to conduct the carjacking and subsequent crimes on February 19, 2023, amongst the following persons and others: Geo OWENS, Jhony MARCHENA, Kentreal EVANS, the possessor of (414) 788-9051, Alfredo ACOSTA, LOCKHART, and Marquis HARRIS. I further believe that ACOSTA traveled with HARRIS' cellphone while HARRIS was at the casino. The conspirators' crimes include violations of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), and Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony).

52. Your Affiant previously obtained Meta Facebook records for Alfredo ACOSTA pursuant to Federal search warrant #23-MJ-140. Those Meta Facebook records revealed a verified cellphone number for ACOSTA as (414) 940-1675. Review of the Facebook records further revealed Facebook messenger communication between ACOSTA and C.B. During the late evening hours of June 17, 2023, ACOSTA sent messages that encouraged C.B. to meet ACOSTA out somewhere, but C.B. was not able to meet ACOSTA. During the early morning hours of June 18, 2023, ACOSTA and C.B. had the following exchange:

> **ACOSTA**: "Quis here lol"
>
> **C.B.**: "On wha lol u see him rn?"

27

**C.B.**: "Who he wit"

**C.B.**: "Shit crazy u in there wit a limp cus of dude bitch bum ass i stg im mad asb now

28

*some shit. I said man, you know what I'm saying—I told him like—you can't, like, feel no type of way 'cause at the end of the day when –if you was to get hit, bro, you gon'-you gon' , you know what I'm saying, you gon' think bad about everybody around you, bro, you feel me? 'cause you know how you move and you don't expect that shit to really happen to you like that, unless it's people that's close to you, you feel me?*

**ACOSTA**: *He said—they said that, what? That G what?*

**JT**: *He said that supposedly, uh, G got on his ass 'cause --he said that supposedly he was thinking it was him and some other---and Monty/Monti that, uh, had, you know what I'm sayin', did that shit to you and shit.*

**ACOSTA**: *hmm*

**JT**: *And I was like, well—I was like well, I don't know my n—gga, like---*

**ACOSTA**: *SPANISH: Hey, are you with them right now?*

**JT**: *SPANISH: They are in the (unintelligible)*

**ACOSTA**: *Oh, okay, okay, okay*

**JT**: *SPANISH: Because they—they—they—they---they---when I got in here they—everyone tries to talk to me, bro, because when I enter places—the units—I don't talk to anyone, bro, I stay in my ENGLISH: lane*

**ACOSTA**: *SPANISH: Hey, don't give that asshole any information, you hear me?*

**JT**: *SPANISH: he's crazy, bro—*

**ACOSTA**: *ENGLISH: Hey, listen---hey, listen*

**JT**: *SPANISH: Tell me, tell me….*

**ACOSTA**: *SPANISH: It was them, you hear me? So be careful. They're going to try to talk to you and get information.*

55.     My interpretation of the above conversation is that J.T. informed ACOSTA that associates of "G" named "Sheisty" and "Monty/Monti"—that is to say associates of Geo Owens:

29

BEHRMAN-MCDONALD and LOCKHART—had something to do with shooting ACOSTA and ACOSTA confirmed those suspicions.

56. Your Affiant also reviewed recorded jail calls placed by Zachary BEHRMAN-MCDONALD (DOB: XX/XX/2002) while he was incarcerated at Dodge Correctional Institution between 8/04/2023 – 10/02/2023 and Oak Hill Correctional Institution between 10/02/2023 – 10/04/2023. The following is a summary of downloaded phone calls placed by BEHRMAN-MCDONALD during this timeframe.

57. On September 18, 2023, at 1:03PM, BEHRMAN-MCDONALD placed a recorded call to (414) 940-9151 and a male answered the call. Phone number (414) 940-9151 is a phone number listed to Damonti LOCKHART at 4280 South 43rd Street, Milwaukee, WI according to the Wisconsin DOC Inmate Solutions payment history. BEHRMAN-MCDONALD asked the male, "Guess who I'm in here with?" and the male asked who. BEHRMAN-MCDONALD explained he was in Dodge Correctional with "Jay" and "Jay" claimed to have been at the Milwaukee County House of Corrections with the male. I believe "Jay" to be J.T from the above paragraph. A query of Milwaukee County Jail records showed that Damonti LOCKHART (DOB: XX/XX/2003) was at the Milwaukee County House of Corrections from May 27, 2023, until his release on GPS monitoring on August 23, 2023. BEHRMAN-MCDONALD further said that Jay was with him at the time of the call. BEHRMAN-MCDONALD further said that Jay is friends with "Fredo" and that "somebody got" Fredo. BEHRMAN-MCDONALD also said, "You need to check-in with somebody, too cuz… he said they took the watch, the Cuban, 60k." [Cuban is a known style for neck chains and ACOSTA reported a necklace was taken during the robbery]. LOCKHART originally appeared to not understand the reference that BEHRMAN-MCDONALD was making. LOCKHART subsequently responded, "Ooh…never…remember, Chubby got the

30

Cuban and they never did get something off (unintelligible)…they never made nothing off that shit…" BEHRMAN-MCDONALD further said that Jay was telling him that "he" thought BEHRMAN-MCDONALD did "that" because BEHRMAN-MCDONALD "fucks with G". BEHRMAN-MCDONALD also said Jay had asked him who "GTS Merk" was and BEHRMAN-MCDONALD said he thinks Jay is referring to "Quis". BEHRMAN-MCDONALD said that Jay had explained the whole story about what happened to Fredo. LOCKHART asked if his name had been brought up and BEHRMAN-MCDONALD said no. BEHRMAN-MCDONALD said Fredo thought "G" had something to do with it. BEHRMAN-MCDONALD further said Jay told him that "they" were going to do the same thing to "G" because "G" had set that up. LOCKHART replied that he would tell "him" right now. BEHRMAN-MCDONALD instructed LOCKHART to tell "him" that something "fishy" was going on. LOCKHART said that Jay knew LOCKHART because LOCKHART'S mother is Jay's "case manager". BEHRMAN-MCDONALD said that Jay said that Fredo was at the club with "GTS Merk" when GTS Merk asked Fredo to see his "water splasher" and then Fredo woke up and was getting hit with the "water splasher", and they put Fredo in a "white SRT". ["Water splasher" is a term often used for a water gun and I believe is used in this phone call to mean a real gun. "White SRT" appears to be a reference to the white Jeep Grand Cherokee SRT used by the robbery suspects as seen in surveillance videos.] Later in this same call, BEHRMAN-MCDONALD said that Jay had saw "G" in a strip club at one point and contacted Fredo and asked Fredo what he wanted to be done, and Fredo told Jay to leave him alone. BEHRMAN-MCDONALD instructed LOCKHART to tell "G" to stop being "so loose" and LOCKHART agreed to relay the message.

31

58.     Your Affiant researched records from the Milwaukee County House of Corrections and found that J.T. was in that facility for an overlapped period of time with LOCKHART in 2023 after the carjacking.

59.     On September 19, 2023, at 11:37AM, BEHRMAN-MCDONALD placed a recorded call to (414) 388-7565 and a male answered the call.  During the call, BEHRMAN-MCDONALD informed the male that "G" was holding onto money for BEHRMAN-MCDONALD.  At the approximate 12:27 mark in the call, BEHRMAN-MCDONALD asked, "…remember I pulled that move with (unintelligible) and them?...and we put dude in a car and shit?"  The male responded with a "yeah".  BEHRMAN-MCDONALD said, "His nigga up in here. He was talking about it…the nigga said he lost a Cartier watch, 60 thousand…why do niggas be lying?" BEHRMAN-MCDONALD said they guy must've "took a loss before that."

60.     On September 19, 2023, at 1:11PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and asked LOCKHART if LOCKHART had talked to "G" and told "G" what BEHRMAN-MCDONALD instructed LOCKHART to share with "G". LOCKHART said that "G" said "dude was soft" and to tell "little brother" to curse him and that "G" will spit in Fredo's mamma's face.

61.     On September 29, 2023, at 1:10PM, BEHRMAN-MCDONALD placed a recorded call to Geo OWENS at (404) 735-9068.  In the preamble of the call BEHRMAN-MCDONALD identified himself to OWENS as "Sheisty".  During the call, OWENS told BEHRMAN-MCDONALD that OWENS was working on a house on 11th Street.  BEHRMAN-MCDONALD asked OWENS if "Cuz" told OWENS what BEHRMAN-MCDONALD has said.  OWENS responded, "About Fred?"  OWENS continued by alluding that he had talked to "Fred" and Fred claimed he had nothing to do with "that" and that he was just "talking".

32

62.     On October 4, 2023, at 1:01PM, BEHRMAN-MCDONALD called (414) 399-4919 (LOCKHART) and no one answered.

63.     On October 4, 2023, at 1:03PM, BEHRMAN-MCDONALD called LOCKHART at (414) 940-9151 and another male answered the call and BEHRMAN-MCDONALD asked where "Monti" was.  BEHRMAN-MCDONALD also told the male to tell LOCKHART that BEHRMAN-MCDONALD just tried calling LOCKHART on his other number and LOCKHART didn't answer. LOCKHART eventually came on the phone to speak to BEHRMAN-MCDONALD.

64.     On October 13, 2023, J.T, placed another recorded jail call to ACOSTA and ACOSTA told J.T. that ACOSTA had recently been contacted by "Monty/Monti".  The following is summary of the recorded jail call between J.T. and ACOSTA on October 13, 2023:

> **ACOSTA**: *On Saturday, he called me. He called me and said---he said---well, he said, oh yeah, I didn't have anything to do with that. I didn't' have anything to do with it…and I told him, asshole, I'm not a fucking idiot, crazy…woo, woo…I know you did it….Sheisty then said----*
>
> **JT**: *Look, it was both of them. You have to tell him, 'look, Sheisty was fucking around there…and you and him were the ones that did it and there were more because he admitted it.' He told me out there at Dodge---*
>
> **ACOSTA**: *Yeah. No, no, no, no, no, no ---listen to me, listen to me…*
>
> **JT**: *what?*
>
> **ACOSTA**: *After---after, when I told him, asshole let say it because this'll incriminate him /put him on the hook. He said, okay, bro, okay, umm, I am sorry but it wasn't for you, you weren't supposed to be there. It was for the "guerrito" (white guy/ fair skinned), woo woo…..* [I believe this is an acknowledgment that the robbery/shooting was meant for C.B. and not ACOSTA]

33

**JT**: *Nah, that's bullshit, bro.*

**ACOSTA**: *he said—he said---umm, it wasn't—I have a video, fool, I—I—I recorded everything. We were scared, woo*

**JT**: *Bro, listen, he's living on M (or N) at Sheisty's mom's house. Tell him to take my name outta his mouth and----*

**ACOSTA**: *yeah, he told me that Jacob Torres and there were---there were two more that were talking, saying "we did it", woo and that---that all over there at that jail they were saying that "we did it" and woo*

**JT**: *he knows---he knows so he's telling me that he is the shooter you so that you come and he was telling me but you know more/better than that, bro. You need to tell them, bro, you need to tell---*

**ACOSTA**: *No, I told him…I told him. And that asshole tells me everything, he tells me who did it, who----who did it to me---I'm telling you, he told me like that, fool, he told me everything. He said, he said, okay, bro, but I didn't do it. It was these people, these people, these people----*

65. My interpretation of the above recorded jail call is that LOCKHART contacted ACOSTA and they discussed the carjacking and shooting, and LOCKHART made admissions, including LOCKHART's statement "I have a video, fool, I recorded everything" concerning the crime(s) committed. I also know that in a recorded jail call between J.T. and ACOSTA on October 17, 2023, ACOSTA said LOCKHART claimed to have taken the video on his "girl's" cellphone via Instagram vanish mode. Based on my training and experience, vanish mode does not result in the file being deleted from the phone but rather allows for the file to be temporarily hidden. I also know that if LOCKHART took a video using his girlfriend's phone and shared via Instagram, the video could easily have been shared with LOCKHART via LOCKHART's cell phone and thus LOCKHART would also possess the video on his cell phone. As stated above, I believe that LOCKHART possessed his cell phone (ending in 4919) at the time of the carjacking and shooting

34

as that phone was in contact with other conspirators both before and after the carjacking and shooting. Thus, despite LOCKHART's statement about using his girlfriend's phone, I believe it's probable that LOCKHART used his cell phone to take the video- as it would only need the video phone app and no other connections to do so. Because LOCKHART had previously denied and minimized his involvement in this offense to ACOSTA, I believe he was similarly misleading ACOSTA as to his involvement and such evidence remains on LOCKHART's cell phone or can be recovered by forensic experts if deleted. Further, I believe the contact that ACOSTA had with LOCKHART in October 2023 would have been via LOCKHART's cellphone by way of phone call, Facebook call, Apple Facetime call, or another communication through a social media app. I know through training and experience that voice or video call(s) between LOCKHART and ACOSTA through social media applications can be captured on LOCKHART'S cellphone device but not reflect in the records captured by his cellphone carrier. Those contacts would be observed in the logs specific to the social media application found on LOCKHART'S device.

66. On October 17, 2023, J.T, placed another recorded jail call to ACOSTA and J.T. told ACOSTA that "Sheisty" (Behrman-McDonald) will get out of prison in three years and "Monty/Monti" (LOCKHART) is living at Behrman-McDonald's mother's house. J.T. went on to tell ACOSTA that "they" store everything at Behrman-McDonald's mother's house, including "everything" that was stolen from ACOSTA. In that same call, ACOSTA again recounted his conversation with LOCKHART in which LOCKHART admitted that he "did it" but LOCKHART didn't mean to do it to ACOSTA.

67. Your Affiant also reviewed data obtained from Apple related to Geo OWENS' iCloud account associated with only1gmusic@gmail.com. The data was obtained via Federal Search Warrant #23-MJ-154 signed by Magistrate Judge William Duffin. A review of internet

35

searches conducted by OWENS showed that he searched the phrase "17th mineral" on February 22, 2023 at approximately 5:52PM, which I believe to be a search related to the shooting scene.

68.     Additionally, Your Affiant reviewed archived Instagram direct messages that were saved in OWENS' iCloud records.  OWENS' records showed an Instagram username of "globaltrapstarr" with ID #6870064961.  The following Instagram direct message thread occurred between OWENS and an unknown subject on February 19, 2023 (Time was adjusted to CST):

**2:22AM (Unknown):** "Poto?? Tell quis DM me back"
**2:30AM (OWENS):** "Tellin him now"
**3:30AM (OWENS)**: "You at pato"
**3:42AM (Unknown):** "No but i could come"
**4:32AM (OWENS)**: "You end up going"

69.     I interpret the above Instagram exchange between OWENS and an unknown user as the unknown user was trying to confirm the meeting location was Potawatomi Casino in Milwaukee, but the unknown user could not reach Marquis HARRIS.  I believe the unknown user was likely solicited to participate in the robbery but did not show-up.

70.     ATF previously obtained Federal Search Warrant 23-MJ-207 signed by Magistrate Judge William Duffin.  That warrant authorized ATF to obtain ping locations for LOCKHART'S cellphone number (414) 399-4919 from T-Mobile. On November 28, 2023, ATF conducted surveillance of 4500 West Westchester Square, Milwaukee, Wisconsin, which is the listed address for L.M., the mother of Zachary Behrman- McDonald.  According to a records query, L.M. pays utilities at 4500 West Westchester.  Additionally, as noted above, a recorded jail call from J.T. to ACOSTA indicated that LOCKHART was staying with the mother of Zachary Behrman-McDonald.  The location ping data provided by T-Mobile indicated that LOCKHART'S cellphone

36

was stationary for a prolonged period of time during the early morning hours of November 28, 2023 in an approximate radius area that included 4500 West Westchester. At approximately 11:52AM on November 28, 2023, Your Affiant observed a black male, whose likeness was consistent with LOCKHART'S booking photographs, exit 4500 West Westchester and enter the driver's door of a blue 2010 Lincoln MKT SUV bearing WI plate ASH-2206 that was parked in the driveway of 4500 West Westchester. LOCKHART then went back inside 4500 West Westchester. Investigators later observed LOCKHART again exit 4500 West Westchester and enter the Lincoln SUV. The Lincoln SUV subsequently backed out of the driveway and left the area at approximately 12:39PM and returned at approximately 1:12PM. Notably, the ping location data for LOCKHART'S cellphone (414) 399-4919 showed it also left the area and returned to the area coinciding with LOCKHART'S travel in the Lincoln SUV. LOCKHART re-entered 4500 West Westchester upon his return.

71.     A records query for the Lincoln MKT SUV with WI plate ASH-2206 showed it to be registered to Zachary Behrman-McDonald.

72.     On November 30, 2023, Your Affiant observed the Lincoln MKT SUV with WI plate ASH-2206 parked in the driveway of 4500 West Westchester at 8:15AM while LOCKHART'S cellphone ping location also placed it in a radius area that included 4500 West Westchester.

73.     On December 1, 2023, at approximately 10:34AM, Your Affiant observed the Lincoln MKT SUV parked curbside on North 72nd Street near the Villas at Granville in Milwaukee, when a person walked from the direction of the Granville condos and got into the vehicle and drove away. At approximately 10:48AM on this same day, another ATF agent observed the Lincoln MKT SUV parked in the driveway at 4500 Westchester. As before, the cellphone ping

37

location data for LOCKHART'S cellphone number (414) 399-4919 showed movement of the cellphone that was consistent with the cellphone traveling with the Lincoln MKT SUV (WI plate ASH-2206).

74. On December 4, 2023, at approximately 11:04AM, Your Affiant observed LOCKHART park the Lincoln MKT SUV (WI plate ASH-2206) in the driveway of 4500 West Westchester and LOCKHART entered the front door of the residence a short time later. The cellphone ping location for (414) 399-4919 showed approximate movement consistent with it traveling with LOCKHART in the Lincoln MKT SUV.

75. On December 5, 2023, at approximately 8:45AM, Your Affiant observed a 2012 Chrysler 200 with Wisconsin plate ALB-1959 parked in the driveway of 4500 West Westchester Square. A records query for the Chrysler 200 showed it to be registered to the Damonti LOCKHART'S mother. Your Affiant subsequently observed the Chrysler 200 pull away from 4500 West Westchester and travel south on 43rd Street at approximately 9:22AM. On this same date, at approximately 9:32AM, Your Affiant located the 2012 Chrysler 200 parked in the driveway of 4280 South 43rd Street, Greenfield, Wisconsin. Your Affiant also observed the Lincoln MKT SUV with Wisconsin plate ASH-2066 parked on the street in front of that house. 4280 South 43rd Street is the listed home of Damonti LOCKHART'S mother. 4280 South 43rd Street is also the address listed for Damonti LOCKHART for the Wisconsin Department of Corrections. The cellphone ping location data for LOCKHART'S cellphone number (414) 399-4919 on this date during the aforementioned timeframe showed movement of the cellphone that was consistent with the cellphone traveling with the Chrysler 200 (WI plate ALB-1959).

76. A review of the ping locations for LOCKHART'S cellphone (414) 399-4919 during the morning hours from November 30, 2023 – December 6, 2023, showed that LOCKHART'S

cellphone was stationary for prolonged periods of time in an approximate area that included 4500 West Westchester Square on all the dates except December 1, 2023. The location data coupled with surveillance observations are consistent with LOCKHART'S cellphone (414) 399-4919 staying overnight at 4500 West Westchester Square on multiple dates.

77. On December 7, 2023, at approximately 2:00 p.m., I was conducting surveillance at 4500 West Westchester Square (PREMISES 1) and observed an individual I recognized to be as LOCKHART arrive at PREMISES 1 and use a key to gain entry. That same day, I accessed LOCKHART's public Facebook account "Racked Low" and recognized a post made on December 5, 2023 by LOCKHART (or someone with access to his account) including two pictures of him, one of which appeared to be LOCKHART lighting a marijuana cigarette with the message "Long live Von Rackz 4ever 21" I believe this to be in reference to reference the recent shooting death of LOCKHART's friend "Von Rackz." I also observed a second post from December 6, 2023, again by either LOCKHART or someone with access to his account, that read "Fire around" followed by the fire and smoke emoji. I know that "fire" is a street term for marijuana and, based on my training and experience, the post advertises the sale of marijuana.

78. On December 12, 2023, ATF executed Federal Search Warrant #23-M-514 at 4500 West Westchester Square, West Milwaukee, Wisconsin. The warrant was signed by Magistrate Judge Stephen Dries. During the security sweep of the residence, the ATF observed who they recognized to be Damonti LOCKHART from a booking photograph. LOCKHART was observed opening the door of bedroom #1 (the third-floor middle bedroom on the attached diagram) and he briefly stepped out of the bedroom before he reentered the bedroom and closed the door. ATF made several commands to LOCKHART to exit the bedroom, but he did not respond. A negotiator with ATF called (414) 399-4919 and LOCKHART answered the call. LOCKHART subsequently

39

agreed to exit the bedroom and walked down the stairs from the 3rd level to the 2nd level while he carried a cellphone in his hand, which was placed on the staircase ledge in the living room. Another occupant of the residence identified the vehicle parked in the driveway [Lincoln MKT SUV (WI plate ASH-2206)] as being driven by LOCKHART. The keys to the Lincoln MKT SUV were located the dresser in LOCKHART'S bedroom. Investigators located and seized items that included the following during the execution of Search Warrant #23-M-514:

A. An Apple iPhone in a black case originally located on LOCKHART'S person and inventoried as ATF Item #99.

79.     During the execution of Search Warrant #23-M-514, Your Affiant and others noted the driver's window was partially open on the aforementioned Lincoln MKT SUV in the driveway. There was a strong and distinct odor consistent with the presence of marijuana emitted from inside the Lincoln. Additionally, Your Affiant and others observed a substance recognized as marijuana located on the dresser in bedroom #1. Investigators also observed gallon sized bags that had the odor and appearance of it previously containing marijuana in bedroom #1. Based on these observations, Your Affiant applied for and received a second search warrant to seize additional evidence related to narcotics trafficking. Investigators maintained control of the residence while the second search warrant was obtained. US Magistrate Judge Stephen Dries signed Search Warrant #23-M-515 on December 12, 2023. That warrant authorized the search for drug trafficking evidence at 4500 West Westchester Square as well as inside the 2010 Lincoln MKT SUV with WI plate ASH-2206. Based on the above observations, the Milwaukee Police Department arrested LOCKHART for possession of marijuana with intent to distribute and had

LOCKHART conveyed to Milwaukee Police Department Central Booking. Investigators located and seized the following items during the execution of Search Warrant #23-M-515:

- $3900 in US paper currency located on LOCKHART'S person in the following denominations: 44 - $5, 37 - $10, 138 - $20, 3 - $50, and 4 - $100.

- Plastic baggie with suspected marijuana located on dresser in bedroom #1. Approximate weight 5.35 grams.

- One round of 9mm ammunition located in bedroom #1.

- Three opened plastic bags suspected as shipping bags for marijuana located in bedroom #1.

- Approximately 362 grams of suspected marijuana edibles located in bedroom #3.

- Approximately 362 grams of suspected marijuana in a large plastic bag located in the center console of the 2010 Lincoln MKT SUV.

- $504 in US paper currency located in the center console of the Lincoln MKT SUV in the following denominations: 34 - $1, 6 - $5, 3 - $10, 18 - $20, and 1 - $50.

- A loaded Glock model 19 9mm pistol with s/n BXFZ411 located between the front passenger seat and center console in the Lincoln MKT SUV.

- A 24-round extended magazine and 20 rounds of 9mm ammunition inside the Glock model 19 9mm pistol with s/n BXFZ411.

- An ANS US Cellular flip cellphone located in the center console of the Lincoln MKT SUV.

- Documents located inside the Lincoln MKT SUV, including documents in the name of Damonti LOCKHART.

- Apple Watch Series 3 with white band located in a duffle bag inside the Lincoln MKT SUV.

41

- Digital scale with green residue located in the center console of the Lincoln MKT SUV.

- A large plastic bag containing approximately 362 grams of suspected marijuana located in a large plastic bag inside a blue duffle bag in the garage.

80.     The documents located inside the Lincoln MKT SUV included West Allis-West Milwaukee School District transcripts in the name of Damonti LOCKHART.  Additionally, investigators located a Scrub-A-Dub Oil Change receipt for an oil change conducted for the 2010 Lincoln MKT SUV on 11/13/2023 in the name of Damonti LOCKHART.  The documents further included a Safe Auto Repair LLC receipt for a brake and rotor service conducted on the 2010 Lincoln MKT SUV on 12/06/2023 in the name of Damonti LOCKHART.  Finally, the documents included a US Cellular New Account Activation Payment Receipt dated 10/31/2023 for phone number (414) 640-2121.   The Milwaukee Police Department located additional US currency on LOCKHART'S person when LOCKHART was processed at Central Booking.  The currency totaled $2935 in the following denominations: 1- $5, 1 - $10, 111 - $20, 6 - $50, and 4 - $100.

81.     A criminal history query of LOCKHART showed he has been previously convicted of felony possession of marijuana with intent to distribute in Milwaukee County and is prohibited from possessing firearms.

82.     A preliminary examination of an iPhone seized from LOCKHART (ATF Item #99) on December 12, 2023 showed that it was assigned phone number (414) 399-4919 and the phone was associated with iCloud account ayblow03@iCloud.com.

83.     Based on the above information, I believe that LOCKHART engaged in unlawful narcotic trafficking while armed in violation of Title 21 U.S.C. § 841 and 846 (distribution of and

possession with intent to distribute controlled substances and conspiracy to do so), Title 18 U.S.C. § 922(g) (possession of a firearm by a prohibited person), as well as Title 18 U.S.C. § 924(c) (possession of a firearm in furtherance of narcotic trafficking).

## **INFORMATION REGARDING APPLE ID AND ICLOUD**

84.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

85.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). s described in further detail below, the services include email, instant messaging, and file storage:

a.   Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.   iMessage and FaceTime allow users of Apple devices to communicate in real- time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.   iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

d.   iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and

43

iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi- Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

86. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication, and syncing mechanism.

44

87.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

88.     Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

89.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs"

45

for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

90. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

91. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS")

46

messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

92. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

93. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

94. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that

47

connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

95. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

96. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

97. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

98. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment

48

B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

99.　Based on the forgoing, I request that the Court issue the proposed search warrant.

100.　Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Apple.  Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Apple IDs and Apple iCloud accounts associated with the following information (**Target Apple iCloud Accounts)**, that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, California 95014.

    A.   **iCloud account <u>ayblow03@iCloud.com</u>**

## ATTACHMENT B

## Particular Things to be Seized

All records and information on the Devices described in Attachment A that relate to a violation of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony), and Title 21 U.S.C. § 841 and 846 (possession with intent to distribute controlled substances, distribution, and conspiracy to do so) including:

    a. Preparatory steps taken in furtherance of these crimes;

    b. Any audio, video, and/or photograph(s) files on the phone of criminal activity or of evidentiary value;

    c. All voicemail and call records;

    d. All text messages;

    e. All social media sites used and applications for social media sites;

    f. All internet activity;

    g. All location data including from the phone and/or from any downloaded applications;

    b. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    c. Records evidencing the use of the Internet Protocol address to communicate, including:

        a. records of Internet Protocol addresses used;

51

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

52

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate

CLERK'S OFFICE
A TRUE COPY
Jan 16, 2024
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with the Apple ID and<br>Apple iCloud account ayblow03@iCloud.com | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.    24    MJ    20

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      01/30/2024      *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Hon. William E. Duffin      .
                                                                                                  *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      01/16/2024 at 9:40 a.m.

*Judge's signature*

City and state:    Milwaukee, Wisconsin                    Honorable William E. Duffin, U.S. Magistrate Judge
                                                                            *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Apple IDs and Apple iCloud accounts associated with the following information (**Target Apple iCloud Accounts)**, that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, California 95014.

    A.   **iCloud account <u>ayblow03@iCloud.com</u>**

1

# ATTACHMENT B

## Particular Things to be Seized

All records and information on the Devices described in Attachment A that relate to a violation of Title 18 U.S.C. § 2119 (carjacking), Title 18 U.S.C. § 924(c) (use of a firearm during the commission of a violent crime), Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), Title 18 U.S.C. §§ 844(h) (use of fire in furtherance of a federal felony), and Title 21 U.S.C. § 841 and 846 (distribution of and possession with intent to distribute controlled substances and conspiracy to do so) including:

a. Preparatory steps taken in furtherance of these crimes;

b. Any audio, video, and/or photograph(s) files on the phone of criminal activity or of evidentiary value;

c. All voicemail and call records;

d. All text messages;

e. All social media sites used and applications for social media sites;

f. All internet activity;

g. All location data including from the phone and/or from any downloaded applications;

b. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c. Records evidencing the use of the Internet Protocol address to communicate, including:

a. records of Internet Protocol addresses used;

2

b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3